NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JUN 24 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS



JUAN RENE VALADEZ PRADO,

Petitioner,

v.

TODD BLANCHE, Acting Attorney General,

Respondent.

No. 25-2709

Agency No.
A205-855-670

MEMORANDUM*

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted June 12, 2026**
San Francisco, California

Before: NGUYEN and VANDYKE, Circuit Judges, and HUIE, District Judge.***
Concurrence by Judge VanDyke.

Petitioner Juan Rene Valadez Prado, a native and citizen of Mexico, petitions

for review of a Board of Immigration Appeals (BIA) decision dismissing his appeal

---

* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

** The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

*** The Honorable Robert Steven Huie, United States District Judge for the Southern District of California, sitting by designation.

from an order by an Immigration Judge (IJ) finding that Petitioner did not demonstrate that his removal will cause exceptional and extremely unusual hardship to a qualifying relative and denying his application for cancellation of removal. We have jurisdiction under 8 U.S.C. § 1252(a), and we deny the petition.

We review for substantial evidence the agency's determination that Petitioner did not show exceptional and extremely unusual hardship to a qualifying relative. *Gonzalez-Juarez v. Bondi*, 137 F.4th 996, 1002–03 (9th Cir. 2025). Under this standard, "we may reverse only if the evidence compels a conclusion contrary to the [agency]'s." *Umana-Escobar v. Garland*, 69 F.4th 544, 550 (9th Cir. 2023). The agency's factual findings underlying its hardship determination are "unreviewable." *Gonzalez-Juarez*, 137 F.4th at 1000 n.2 (quoting *Wilkinson v. Garland*, 601 U.S. 209, 225 (2024)); *see* 8 U.S.C. § 1252(a)(2)(B)(i).

1. The record does not compel the conclusion that Petitioner demonstrated that his removal "would result in exceptional and extremely unusual hardship" to his qualifying relatives. 8 U.S.C. § 1229b(b)(1)(D). Hardship is exceptional and extremely unusual if it is "exceedingly uncommon" and "deviates, in the extreme, from the hardship that ordinarily occurs in removal cases." *Gonzalez-Juarez*, 137 F.4th at 1006–07. The agency found that Petitioner had not shown that any of his qualifying relatives suffers from a serious medical condition. It also found that while Petitioner's wife and children would "miss him terribly," "such anxiety due to family

separation is not uncommon." And nothing else in the record compels the contrary conclusion that Petitioner's family will suffer an exceedingly uncommon degree of hardship from his removal. Nor was it fundamentally unfair that Petitioner's counsel told Petitioner's wife she did not "have to get into detail" when counsel asked her to elaborate on her testimony about "anxiety attacks and issues." The burden was on Petitioner to show eligibility for relief from removal. *See* 8 U.S.C. § 1229a(c)(4)(A)(i). Accordingly, substantial evidence supports the agency's determination that Petitioner's family will not suffer "substantially more" harm than what normally results from the removal of family members.

2. Petitioner also disputes the agency's factual findings about his wife's anxiety and the medical condition of one of his sons. But we lack jurisdiction to consider Petitioner's challenge to the agency's factual findings. *See Gonzalez-Juarez*, 137 F.4th at 1000 n.2.

**PETITION DENIED.**

*Valadez Prado v. Blanche*, No. 25-2709
VANDYKE, Circuit Judge, concurring:

There's a useful maxim from systems theory: *The purpose of a system is what it does*. The idea is simple, but profound: If you want to know *why* something exists, don't look at the stated intentions of those who created it, manage it, or promote it. Look at what it *produces*.[1] As the theorist who coined the phrase explained, "There is … no point in claiming that the purpose of a system is to do what it constantly fails to do."[2] Applying this framework to our court's system for handling stays of removal in immigration cases yields some valuable insights.

Since 2019, our court has automatically handed out administrative stays of removal to every immigration petitioner who asks for one, even though we know that the overwhelming majority of applications are meritless. At the same time, we've "adopted the internal practice of holding technically unresolved stay motions within the Clerk's Office" until briefing is completed and the case assigned to a merits panel for final disposition. *Rojas-Espinoza v. Bondi* (*Rojas II*), 167 F.4th 1069, 1073 (9th Cir. 2026) (VanDyke, J., dissenting from the grant of rehearing en

---

[1] This idea echoes a similarly wise teaching of much older vintage: "You will know them by their fruits." Matthew 7:16.

[2] David Benjamin & David Komlos, *The Purpose of a System Is What It Does, Not What It Claims to Do*, Forbes, (Sep. 13, 2021), *available at* https://www.forbes.com/sites/benjaminkomlos/2021/09/13/the-purpose-of-a-system-is-what-it-does-not-what-it-claims-to-do/ [https://perma.cc/V87J-A7Z7] (last visited May 21, 2026).

1

banc). As I and others have written elsewhere, this practice is obviously unlawful. It violates the Supreme Court's command that stays of removal are "not a matter of right," and that courts must not "reflexively hold[] a final order in abeyance pending review." *Nken v. Holder*, 556 U.S. 418, 427, 433 (2009) (citations omitted). It frustrates the "public interest in prompt execution of removal orders." *Id.* at 436. And while the alien is supposed to bear the burden to show why a stay is warranted, *id.* at 433–34, our system requires the government, in Sisyphean fashion, to litigate the case twice—effectively being required to rebut the default entitlement to a stay and then answering the petition for review—all merely to perhaps shave a few months off the back end of an entirely unmerited default stay.

So why would we do this? The *stated* purpose of our court's automatic-stay and deferred-review system is to manage an overwhelming immigration caseload. *See, e.g.*, *Rojas-Espinoza v. Bondi* (*Rojas III*), 169 F.4th 967, 967–68 (9th Cir. 2026) (en banc) (Murguia, C.J., concurring in order). But the *effects* of that system tell a different story. Our automatic-stay and deferred-review system provides immigration petitioners "an open tap of time to remain in the United States, no matter how meritless their claims might be." *Rojas II*, 167 F.4th at 1078 (VanDyke, J., disgrantle). This, in turn, floods our docket with thousands of meritless immigration petitions and equally meritless stay motions, making our caseload problems far worse. *Id.* at 1070. It also multiplies work on meritless cases for the executive

2

branch, which has even more of an overwhelming immigration caseload than we do, since the government litigates immigration cases across the nation, not just in this circuit. Perhaps a worse effect still is that our court's automatic-stay practice places the government in an inescapable double-bind as it attempts to execute lawful removal orders in this circuit. Every petitioner who asks for a stay gets one, and if the government does not oppose it, it's deemed to consent to the stay of removal. *See* 9th Cir. General Order 6.4(c)(5). But if the government does extra work and opposes the stay and we ultimately agree to deny it—usually too late to make any practical difference—the government technically "wins" and thus has no effective means of challenging our unlawful practice. So a petitioner will receive either 100% of an unmerited stay, or—if the government wants to litigate the case twice—effectively the same stay minus a few months. And either way, the government is prevented from challenging in the Supreme Court the patently unlawful process that produces these perverse incentives.

Systems theory would suggest that this heads-I-win, tails-you-lose outcome is a design feature rather than a bug. The purpose of our automatic-stay and deferred-review system is not what we *say* (caseload management) but what it *does* (free stays to all immigration petitioners that are virtually impossible to effectively challenge, leading to more immigration petitions, leading to more free stays … on and on *ad infinitum*).

3

## I.

To illustrate that our system's purpose is what it does, look no further than this case. More than 10 years ago, Juan Rene Valadez Prado—a native and citizen of Mexico who resided unlawfully for an unknown time in the United States—was arrested for assault, and the government placed him in removal proceedings.[3] The IJ denied Prado's application for cancellation of removal, and the BIA dismissed his appeal. Prado then filed a meritless petition for review followed by an even more threadbare motion for stay of removal. But Prado was in the Ninth Circuit, so he naturally received a free, entirely undeserved stay of his removal that began in April 2025 and ended less than a month ago.[4]

Mind you, the government acquiesced to none of this. It first opposed Prado's stay motion in June 2025 and asked our court to "promptly" allow Prado's removal. More than seven months passed, and the government again asked us to "expeditiously deny" the stay when it filed its answering brief. And a few weeks ago, it asked us, a third time, for an expedited ruling denying Prado's meritless stay request. The government did everything it was supposed to do. And once this case

---

[3] Prado received a DUI conviction less than a year after his assault arrest for driving with a blood alcohol level of .20.

[4] The stay order dissolved temporarily between July 14, 2025, and August 13, 2025, when our court temporarily dismissed the petition for review because Prado had not filed a motion to proceed in forma pauperis or paid the required filing fee. When Prado paid the fee, the petition was reinstated and the stay was restored the next day.

was finally squarely in front of a panel of Article III judges, we promptly denied Prado's motion.

What did the government gain from working extra hard to expeditiously clear every procedural hurdle our system placed in front of it to oppose a stay motion that should have been rejected out-of-hand over a year ago?  Rather than receiving 100% of a stay pending disposition of his petition for review, Prado received 94%, when he deserved exactly 0%.

*The purpose of a system is what it does.*

## II.

Our court's answer to all this?  "Don't worry!  We've created a committee to look into it."  *See, e.g.*, *Rojas III*, 169 F.4th at 967–68 (Murguia, C.J., concurring in order) ("[A] review has already been initiated to reexamine the most efficient way to manage the court's enormous immigration docket, including the court's stay-of-removal procedures.");  *cf. id.* at 970 (statement of Tung, J.).  Reasonable people are often generally skeptical about committees' ability to get things done well and in a timely fashion, and for good reason.  But committees do sometimes turn out something useful.  So it's entirely possible that the stay committee here could do the right thing: it could *permanently* and *publicly* replace our current unlawful practice with one that meets the requirements of *Nken*.  Instead of "reflexively holding" stay motions "in abeyance pending review," *Nken*, 556 U.S. at 427, we could require the

5

Clerk's Office to send opposed, fully briefed stay motions to the next available motions panel for prompt resolution.  In other words, the committee could follow exactly what the panel in *Rojas-Espinoza* recommended.[5]  *See Rojas-Espinoza v. Bondi (Rojas I)*, 160 F.4th 991, 1002 (9th Cir. 2025) (requiring opposed, fully briefed stay motions to be "presented by the Clerk's Office to the next available motions panel"), *reh'g en banc granted, opinion vacated*, 167 F.4th 1069, *and on reh'g en banc*, 169 F.4th 967.

If the committee were to find a way to send fully briefed stay motions promptly to the first available motions panel—without changing any court rules—then it would seem that we can (and should) fix our unlawful stay procedures, notwithstanding the prior handwringing that we couldn't and shouldn't.  This would be a welcome outcome.  But it would also raise two obvious questions.  First, why weren't we doing this all along?  And second, what was the point in calling *Rojas-Espinoza* en banc and vacating the panel's decision, only to end up in the same place?

---

[5] I'd be remiss not to mention that the committee process is ironic given some court members' accusation that the panel in *Rojas-Espinoza* addressed our court's unlawful automatic-stay practice outside "the adversarial process."  *Rojas III*, 169 F.4th at 967 (Murguia, C.J., concurring in order).  Now, our court's plainly unlawful practice will be reviewed far from the public eye, outside of litigation, entombed safely within the impenetrable bureaucracy of a committee.  Again: *the purpose of a system is what it does*.

* * *

Charlie Munger famously quipped that "only when the tide goes out do you discover who's swimming naked."  Before *Rojas-Espinoza*, our court's unlawful automatic-grant and deferred-review practice received virtually no attention despite its obvious illegality and detrimental effects on this country's immigration system. But now, thanks to the *Rojas-Espinoza* saga, the tide has gone out on our court's indefensible practice.  And as much as we might dislike it, our court was caught swimming with our bathing suits on the shore.

We should come clean and publicly and irrevocably correct our mistake. After all, one of the core parts of our job is to call out violations of the law.  If we can't openly acknowledge and correct our own legal faux pas, we risk losing credibility when we tell other branches of the federal government to correct theirs.